JS 44
(Rev. 3/99)

# ORIGINAL



# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

JACK FRIEDBERG on behalf of
HALLIBURTON Co.

## DEFENDANTS

David J. Lesar, Robert Crandall, Kenneth Derr,
Charles DiBona, Lawrence Engleburger, William
Howell, Ray Hunt, Aylwin Lewis, J. Landis Martain
Jay Precourt, Deborah Reed, C.J. Silas & Halliburton Co.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Oklahoma County, OK
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) Dallas County
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

## 3-03CV0537-L

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cafiero, Lenahan & Lafuente P.C.
2926 Maple Ave., Suite 200
Dallas, TX 75201   (214) 922-9200

ATTORNEYS (IF KNOWN)

Jose L. Gonzalez, Goodwin & Cluber P.C.
1201 Elm St., Suite 1700
Dallas, TX 75270   (214) 939-4400

RECEIVED
MAR 12 2003
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 810 Selective Service |
| | | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

Transferred from
☐ 5 another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Breach of Fiduciary Duty - Diversity

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE David C. Godbey

DOCKET NUMBER 3:02-CV-1152-N

DATE
11 March 2003

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

ORIGINAL

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

**MAR 1 2 2003**

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| Jack Friedberg, Derivatively on Behalf of Nominal Defendant HALLIBURTON COMPANY Plaintiffs, | ) ) ) ) ) |
| v. | ) ) |
| DAVID J. LESAR, ROBERT L. CRANDALL, KENNETH T. DERR, CHARLES J. DiBONA, LAWRENCE S. EAGLEBURGER, WILLIAM R. HOWELL, RAY L. HUNT, AYLWIN B. LEWIS, J. LANDIS MARTIN, JAY A. PRECOURT, DEBORAH L. REED, C.J. SILAS, Defendants, | ) ) ) ) ) ) ) ) ) |
| and | ) ) |
| HALLIBURTON COMPANY Nominal Defendant. | ) ) ) ) |

**3-03CV0537-L**
Civ. Act No. _____

## DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.  This is a Shareholders Derivative action brought for the benefit of Nominal Defendant Halliburton Company ("Halliburton" or the "Company") against Defendants David J. Lesar, Robert L. Crandall, Kenneth T. Derr, Charles J. DiBona, Lawrence S. Eagleburger, William R. Howell, Ray L. Hunt, Aylwin B. Lewis, J. Landis Martin, Jay A. Precourt, Deborah L. Reed and C.J. Silas seeking to remedy the director/defendants breaches of fiduciary duty, waste of corporate assets and gross mismanagement.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $ 75,000.00, exclusive of interest and costs.

3. This action is not a collusive one designed to confer jurisdiction on a Court of the United States which is would not otherwise have.

4. Venue is proper in the District because a substantial portion of the transactions and wrongs complained of herein, including Defendants, David J. Lesar, Robert L. Crandall, Kenneth T. Derr, Charles J. DiBona, Lawrence S. Eagleburger, William R. Howell, Ray L. Hunt, Aylwin B. Lewis, J. Landis Martin, Jay A. Precourt, Deborah L. Reed and C.J. Silas ("Director Defendants") participation in the wrongful acts detailed herein, occurred in this District. Director Defendants, either reside in, or maintain executive offices or participate in board meetings in this District, and have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

5. Plaintiff, Jack Friedberg is a citizen of Oklahoma, is and was at all relevant times, a shareholder of Nominal Defendant Halliburton Company.

6. Nominal Defendant Halliburton Company is a Delaware corporation with its principal offices located at 3600 Lincoln Plaza, 500 North Akard Street, Dallas, Texas. According to its public filings, Halliburton provides a variety of services, products, maintenance, engineering and construction services to energy, industrial and governmental customers.

7. Defendant David J. Lesar ("Lesar"), who is a resident of Dallas, Texas was at all relevant times the Chief Executive Officer and Chairman of the Board of the Company since 1995.

2

8.     Defendant Robert L. Crandall ("Crandall") has served as a director of Halliburton since 1986.

9.     Defendant Kenneth T. Derr ("Derr") has served as a director of Halliburton since 2001.

10.    Defendant Charles J. DiBona ("DiBona") has served as a director of Halliburton since 1997.

11.    Defendant Lawrence S. Eagleburger ("Eagleburger") has served as a director of Halliburton since 1998.

12.    Defendant William R. Howell ("Howell") has served as a director of Halliburton since 1991.

13.    Defendant Ray L. Hunt ("Hunt") has served as a director of Halliburton since 1991.

14.    Defendant Aylwin B. Lewis ("Lewis") has served as a director of Halliburton since 2001.

15.    Defendant J. Landis Martin ("Martin") has served as a director of Halliburton since 1998.

16.    Defendant Jay A. Precourt ("Precourt") has served as a director of Halliburton since 1998.

17.    Defendant Deborah L. Reed ("Reed") has served as a director of Halliburton since 2001.

18.    Defendant C.J. Silas ("Silas") has served as a director of Halliburton since 1993.

## FACTUAL ALLEGATIONS

19.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the individual defendants owed the Company and shareholders fiduciary obligations of good faith, trust, loyalty and due care and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The individual Defendants were and are required to act in furtherance of the best interest of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and highest obligations of fair dealing.

3

20. The Director Defendants constitute a controlling vote of the Board of Directors of Halliburton at the times relevant herein. Each of the Director Defendants was the agent of each and every other director and of Halliburton with regard to all events and actions described herein and was acting within the course and scope of such agency at all relevant times.

21. Halliburton provides a variety of services, products, maintenance, engineering and construction services to energy, industrial and governmental customers. The Company has two (2) business segments, the Energy Services Group and the Engineering Construction Group:

   a. Energy Services Group: This segment provides services and products for the exploration, development and production of oil and gas. In addition, the Company provides what it calls "integrated solutions" to energy companies, ranging from initial evaluation of producing formations to drilling, production and well maintenance.

   b. Engineering and Construction Group: This segment provides a wide range of engineering and construction services to energy, industrial and governmental customers. The segment conducts its business in over 100 countries worldwide.

22. From the period between July 22, 1999 and May 28, 2002, Halliburton improperly recognized revenues in connection with its long-term construction projects in violation of generally accepted accounting principles ("GAA"). Beginning in the fourth quarter of 1998 and without making disclosure to its investors, the Company altered its accounting policies so that it could report at least $ 89 million of revenues to cover disputed cost overruns on a long-term construction projects, on the undisclosed assumption that its customers would pay disputed amounts. At the time of the undisclosed accounting change, the Company had been facing a very difficult year with lower oil prices adversely impacting its business and reported a net loss of $ 14.7 million for the year end in December 31, 1998 as compared to a net income of $ 722.4 million the year before. In addition, in the third quarter of 1998, shortly before the accounting change was made, the Company had just completed its acquisition of Dresser Industries, Inc. which had been suffering from an onslaught of

4

hundreds of thousands of asbestos-related law suits.

23. **Based on the change in revenue recognition, for the year ended December 31, 1999, the Company reported unbilled receivables of $98 million. For the year ended December 31, 2000, the Company reported unbilled receivables of $113 million. For the year ended December 31, 2001, the Company reported unbilled receivables of $234 million. The revenue recognition arising from the Company's undisclosed accounting change beginning in the fourth quarter of 1998 and continuing throughout the Class Period violated GAAP because the revenues recognized were not probable and could not be reliably estimated.**

24. The accounting rule governing revenue recognition for long-term construction-type contracts, statement of position 81-1, states:

> Claims are amounts in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers or others for customer-caused delays, errors in specifications and designs, contract terminations, change orders in dispute or unapproved as to both scope and price, or other causes of unanticipated additional costs. Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated. [Emphasis added.]

25. In addition to violating GAAP, the Company's undisclosed accounting change was a departure from both the Company's long-standing accounting policies and general industry-wide practice, which is not to record revenue on claims or change orders without customer approval.

26. The effect of the Company's undisclosed accounting change, which is referred to in accounting parlance as a "change in accounting principle," was to materially inflate Halliburton's revenues and earnings throughout the Class Period. For example, in the fourth quarter of 1998, the Company reported $175 million of pre-tax operating profits. If not for the accounting change in that quarter, more than half of these reported profits would have been eliminated. Under the Company's previous, long- standing accounting policy, the cost overruns would not have been concealed by the

5

recognition of revenue, but recognized as losses; revenue would not have been recognized by the

Company unless and until the customers agreed to pay Halliburton additional amounts to cover its

disputed claims or change orders.

27.    The Company also violated the GAAP principles governing changes in accounting policies as set

forth in Opinions of the Accounting Principles Board ("APB") No. 20, an accounting principle

should not be changed unless the change results in an accounting treatment that is preferable:

> The Board concludes that in the preparation of financial statements there is a presumption
> that an accounting principle once adopted should not be changed in accounting for events and
> transactions of a similar type. Consistent use of accounting principles from one accounting
> period to another enhances the utility of financial statements to users by facilitating analysis
> and understanding of comparative accounting data.
>
> The presumption that an entity should not change an accounting principle may be overcome
> only if the enterprise justifies the use of an alternative acceptable accounting principle on the
> basis that it is preferable. [Emphasis added.]

28.    APB No. 20 further states that the nature and justification for a change in accounting principle

should be disclosed in a company's financial statements at the time it is made:

> The nature and justification for a change in accounting principle and its effect on income
> should be disclosed in the financial statements of the period in which the change is made.
> The justification for the change should explain clearly why the newly adopted accounting
> principle is preferable. [Emphasis added.]

APB No. 20 also requires a company making a change in accounting principle to specifically

disclose "[t]he effect of adopting the new accounting principle on income."

29.    APB No. 20 defines a change in accounting principle to include not only a change from one

generally accepted accounting principle to another, but also a change in the method of applying a

particular accounting principle:

> A change in accounting principle results from adoption of a generally accepted accounting
> principle different from the one used previously for reporting purposes. The term accounting
> principle includes not only accounting principles and practices but also the methods of
> applying them.

6

Changes in accounting principle are numerous and varied. They include . . . a change in the method of accounting for long- term construction- type contracts . . . . [Emphasis in original.]

30.    As set forth below, Halliburton's change in accounting principle was not disclosed or justified in any of the Company's Class Period financial statements nor was the enhancing effect of the change on Halliburton's net income specifically disclosed as required by GAAP. Instead, the Company made no disclosure of any change in its 1998 Form 10-K issued shortly before the start of the Class Period. Thereafter, in the Company's 1999, 2000, 2001 and 2002 Forms 10-K issued during the Class Period the Company merely stated that: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable." In violation of GAAP, this statement did not disclose that this policy represented a change in Halliburton's revenue recognition policy, nor did the Company attempt to justify the basis for such a change, why it was preferable or disclose the effect of the change on net income. As such, the Company's reported financial results and financial statements issued throughout the Class Period were materially false and misleading when made.

31.    On May 22, 2002, *The New York Times* reported Halliburton's secret accounting change. According to the *Times* article, the Company was suffering from large losses on some of its long- term construction contracts and was under pressure to increase revenue as its stock price fell because of industry-wide problems. The article cited interviews with former executives of Dresser, acquired by Halliburton in the third quarter of 1998, who stated that the accounting policy was changed with the specific intention of masking Halliburton's declining results:

Two former executives of Dresser Industries, which merged with Halliburton in 1998, said that they concluded after the merger that Halliburton had instituted aggressive accounting practices to obscure its losses.

Much of Halliburton's business comes from big construction projects, like natural gas processing plants, which sometimes ran over budget. With the policy change, Halliburton began to book revenue on the assumption that its customers would pay at least part of the cost

7

overruns, although they remained in dispute. Before 1998, the company had been more conservative, reporting revenue from overruns only after settling with its customers.

Though resolving such disputes can take months or years, the company decided it was reasonable to recognize at least part of the revenue from the claims even while they remained in dispute, [Company CFO] Foshee said.

That explanation was disputed by the former Dresser executives who joined Halliburton after the merger. They said . . . that the company made the accounting change to obscure large losses on several important construction contracts. [Emphasis added.]

*The New York Times* further reported that the accounting change was specifically approved by Lesar,

a former director of Andersen.  Highlighting the importance of the accounting change for the

Company, *The New York Times* further reported that the change "came at an important moment for

Halliburton" which was "eager to win back investors' confidence after its take over of Dresser:"

Exactly how much of that revenue turned into profits for the company is not stated in Halliburton's financial reports. But the impact would have been significant had the company taken the alternative route of writing the cost overruns as losses, wiping out more than half of its $175 million in pretax operating profits for the fourth quarter [of 1998], when the accounting change took effect.

32.        Halliburton immediately responded to the *Times* article by making an upbeat

presentation to securities analysts on the same day regarding the Company's future business

prospects.  Among other things, the Company told analysts about expected cost savings and efforts

to contain the Company's asbestos liabilities. For example, on May 23, 2002, Reuters quoted UBS

Warburg analyst James Stone as stating: "They did a very good job of getting people to focus on the

operating side of Halliburton for the first time in six months and what they had to say was well

received. I think people are getting more comfortable that the asbestos problem is not intractable, is

not going to be a death knell."

33.        However, on May 29, 2002, the Company disclosed that the SEC was conducting a

preliminary investigation of the Company's accounting treatment for cost overruns on construction

projects.

34.        On that date, July 22, 1999, Halliburton issued a press release announcing financial results for its second fiscal quarter of 1999, ended June 30, 1999. According to the press release, total revenues were $3.7 billion for the quarter, net income was $83 million, or $0.19 per diluted share.

35.    On August 13, 1999, Halliburton filed its Report on SEC Form 10-Q for the second quarter of 1999, the period ended June 30, 1999, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein complied with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 1999, and the results of our operations for the three and six months ended June 30, 1999, and our cash flows for the six months then ended. [Emphasis added.]

36.    On October 21, 1999, Halliburton issued a press release announcing its results for the third quarter of 1999, the period ended September 30, 1999. The Company reported net income of $58 million for the quarter, or $0.13 per diluted share, a vast improvement over the $527 million loss it incurred in the third quarter of 1998, which included a $722 million charge related to the acquisition of Dresser.

37.    On November 15, 1999, Halliburton filed its Form 10-Q with the SEC for the third quarter of 1999, the period ended September 30, 1999, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein complied with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 1999, and the results of our operations for the three and nine months ended September 30, 1999, and our cash flows for the nine months then ended.[Emphasis added.]

38.     On January 27, 2000, Halliburton issued a press release announcing results for its

fourth quarter and year ended December 31, 1999. For the fourth quarter, Halliburton reported net

income of $76 million (excluding an extraordinary gain on an asset sale), or $0.17 per diluted share -

- an increase over the previous year's fourth quarter net income of $66 million ($0.15 per diluted

share). Revenues for the quarter reportedly were $3.8 billion. For the year 1999, revenues were

reported as $14.9 billion, with net income of $438 million, or $0.68 per diluted share.

39.     On March 14, 2000, Halliburton filed its Report on SEC Form 10-K with the SEC for

the year ended December 31, 1999, which confirmed the previously announced financial results. The

Form 10-K represented that the Company employed accounting principles in accordance with GAAP

and had prepared its financial statements in accordance with GAAP. The "Revenue and Income

Recognition" section of the 1999 10-K stated as follows:

> Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based upon the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable.

10

The "Receivables" section of the 1999 Form 10-K stated that claims and change orders included in

unbilled receivables amounted to $98 million and $89 million at December 31, 1999 and 1998

respectively and were generally expected to be collected in the following year.

40.     Halliburton's statements in paragraphs 34-39, above, regarding the Company's 1999 financial results

were materially false and misleading when made for the reasons set forth above. In violation of

GAAP, the Company recognized as much as $98 million of revenue in 1999 based on disputed

claims.  Payment on these claims was not probable, and could not be reliably estimated.

Furthermore, in violation of GAAP, the Company's 1999 financial statements did not reveal that any

change in accounting principle had taken place, nor did the Company attempt to justify the basis for

such a change or why it was preferable to disclose the effect of the change on net income. The effect

of the Company's change was material as Halliburton avoided the recognition of as much as $98

million of costs as compared to a reported net income of $438 million for the 1999 year.

41.     On April 26, 2000, Halliburton issued a press release announcing its results for the first quarter of

2000, the period ended March 31, 2000. According to the press release, the Company's revenues for

the quarter were $2.9 billion and net income was reportedly $49 million, or $0.48 per diluted share,

excluding a gain on an interest in a joint venture.

42.     On May 15, 2000, Halliburton filed its Report on SEC Form 10-Q for the first quarter of 2000, the

period ended March 31, 2000, which confirmed the previously announced financial results. In

addition, the Form 10-Q represented that the financial statements contained  therein complied with

GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

The accompanying unaudited condensed consolidated financial statements were prepared

11

using generally accepted accounting principles for interim financial information and the instructions to form 10- Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K.

In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 20000, and the results of our operations for the three months ended March 31, 2000, and our cash flows for the three months then ended. [Emphasis added.]

43.     On July 26, 2000, Halliburton issued a press release announcing results for the second quarter of

2000, the period ended June 30, 2000. The Company reported net income of $75 million, or $0.17

per diluted share.

44.     On August 10, 2000, Halliburton filed its Report on SEC Form 10-Q for the second quarter of 2000,

the period ended June 30, 2000, which confirmed the previously announced financial results. In

addition, the Form 10-Q represented that the financial statements contained therein complied with

GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting  principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2000, and the results of our operations for the three and six months ended June 30, 2000, and our cash flows for the six months then ended. [Emphasis added.]

45.     On October 24, 2000, Halliburton issued a press release announcing its financial results for the third

quarter of 2000, the period ended September 30, 2000. According to the release, the Company

reported net earnings of $157 million, or $0.35 per diluted share and revenues of $3 billion.

46.     On November 9, 2000, the Company filed a Report on SEC Form 10-Q for the third quarter of 2000,

the period ended September 30, 2000, which confirmed the previously announced financial results.

In addition, the Form 10-Q represented that the financial statements contained therein complied with

GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared
> using generally accepted accounting principles for interim financial information and the
> instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these
> financial statements do not include all information and footnotes required by generally
> accepted accounting principles for complete financial statements and should be read in
> conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been
> reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial
> position as of September 30, 2000, and the results of our operations for the three and nine
> months ended September 30, 2000, and our cash flows for the nine months then ended.
> [Emphasis added.]

47.     On January 30, 2001, Halliburton issued a press release announcing its financial

results for the fourth quarter and year ended December 31, 2000 The Company reported net income

of $123 million, or $0.28 per diluted share. Revenues for the quarter were $3.2 billion, a 6% increase

over the 1999 fourth quarter. For the year ended December 31, 2000, the Company reported revenues

of $7.9 billion and net income of $501 million.

48.     On March 27, 2001, Halliburton filed its Report on SEC Form 10-K for the year

ended December 31, 2000, which confirmed the previously announced financial results. The Form

10-K represented that the Company employed accounting principles in accordance with GAAP and

had prepared its financial statements in accordance with GAAP. The Company's revenue recognition

policy was described in the same format as the previous year's Form 10-K. The 2000 Form 10-K

stated as follows:

13

Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based upon the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable.

The "Receivables" section of the 2000 Form 10-K stated that claims and change orders included in unbilled receivables amounted to $113 million and $98 million at December 31, 2000 and 1999 respectively and were generally expected to be collected in the following year.

49.    Halliburton's statements in paragraphs 41-48, above, regarding the Company's 2000 financial results were materially false and misleading when made for the reasons set forth above. In violation of GAAP, the Company recognized as much as $113 million of revenue in 2000 which was not probable and could not be reliably estimated. In further in violation of GAAP, the Company's 2000 financial statements did not reveal that any change in accounting principle had taken place, nor did the Company attempt to justify the basis for such a change or why it was preferable or disclose the effect of the change on net income. The effect of Halliburton's change was material as the Company avoided the recognition of as much as $113 million of costs as compared to a reported net income of $501 million for the 2000 year.

50.    On April 26, 2001, Halliburton issued a press release announcing an impressive 219% increase in net income for the first quarter of 2001 over the first quarter of 2001. According to the release, net earnings of $86 million, or $0.25 per diluted share, for the quarter were driven by revenues of $3.1 billion, a 10% year-over-year increase.

51.    On May 11, 2001, Halliburton filed its Report on SEC Form 10-Q for the first quarter of 2001, the period ended March 31, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein complied with

GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared
> using generally accepted accounting principles for interim financial information and the
> instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these
> financial statements do not include all information and footnotes required by generally
> accepted accounting principles for complete financial statements and should be read in
> conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been
> reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial
> position as of March 31, 2001, and the results of our operations for the three months ended
> March 31,2001, and our cash flows for the three months then ended. [Emphasis added.]

52.         In a July 25, 2001, Halliburton issued a press release headlined "Halliburton Second

Quarter [2001] Revenues and Earnings Continue to Soar." According to the release, net income from

continuing operations for the second quarter of 2001, ended June 30, 2001, was $143 million, or

$0.33 per diluted share, an increase of 175% over the previous first quarter. Also impressive was the

Company's reported revenues of $3.3 billion, a 16% year-over-year increase.

53.         On August 9, 2001, Halliburton filed its Report on SEC Form 10-Q for the second

quarter of 2001, the period ended June 30, 2001, which confirmed the previously announced

financial results. In addition, the Form 10-Q represented that the financial statements contained

therein complied with GAAP requirements for interim financial reports and that the filing presented

Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled

"Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared
> using generally accepted accounting principles for interim financial information and the
> instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these
> financial statements do not include all  information and footnotes required by generally
> accepted accounting principles for complete financial statements and should be read in
> conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been

reclassified to conform with the current presentation.

In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2001, and the results of our operations for the three and six months ended June 30, 2001, and our cash flows for the six months then ended. [Emphasis added.]

54.        On October 23, 2001, Halliburton issued a press release, headlined "Halliburton

reports Record Profits", announcing its financial results for the third quarter of 2001, the period

ended September 30, 2001. Net income from continuing operations was reportedly $181 million, or

$0.42 per diluted share, a 39% year- over- year increase. Revenues of $3.4 billion rose by 12% from

the 2000 third quarter.

55.    On November 8, 2001, the Company filed a Form 10-Q with the SEC for the third quarter of 2001,

the period ended September 30, 2001, which confirmed the previously announced financial results.

In addition, the Form 10-Q represented that the financial statements contained therein complied with

GAAP requirements for interim financial reports and that the filing presented Halliburton's finances

fairly, stating the following in note 1 to the quarterly financial statement, titled "Management

Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly  our financial position as of September 30, 2001, and the results of our operations for the three and nine months ended September 30, 2001, and our cash flows for the nine months then ended.[Emphasis added.]

56.    On January 23, 2002, Halliburton issued a press release headlined "Halliburton Fourth Quarter

[2002] 33 Cents EPS Caps Outstanding Year." The Company reported fourth quarter of 2001 (ended

December 31, 2001) net income from continuing operations of $141 million, or $0.33 per diluted

16

share. For the 2001 year, net income from continuing operations was reportedly $551 million, or

$1.28 per diluted share. Revenues for the fourth quarter and 2001 were $3.2 billion and $13 billion,

respectively.

57.     On March 12, 2002, Halliburton filed its Report on SEC Form 10-K for the year ended December

31, 2001, which confirmed the previously announced financial results. The Form 10-K represented

that the Company employed accounting principles in accordance with GAAP and had prepared its

financial statements in accordance with GAAP. The Company's revenue recognition policy is set

forth as follows:

> Revenues and income recognition. We recognize revenues as services are rendered or
> products are shipped. The distinction between services and product sales is based on the
> overall activity of the particular business operation. Revenues from engineering and
> construction contracts are reported on the percentage of completion method of accounting
> using measurements of progress towards completion appropriate for the work performed.
> Progress is generally based upon physical progress, man- hours or costs incurred based upon
> the appropriate method for the type of job. All known or anticipated losses on contracts are
> provided for currently. Claims and change orders which are in the process of being negotiated
> with customers, for extra work or changes in the scope of work are, included in revenue when
> collection is deemed probable.

The "Receivables" section of the 2001 Form 10-K stated that claims and change orders included in

unbilled receivables amounted to $234 million and $113 million at December 31, 2001 and 2000

respectively.

58.             Halliburton's statements in paragraphs 50-57, above, regarding the Company's 2001

financial results were materially false and misleading when made for the reasons set forth above. In

violation of GAAP, the Company recognized as much as $234 million and at least $121 million of

revenue in 2001 which was not probable and could not be reliably estimated. In further violation of

GAAP, the Company's 2001 financial statements did not reveal that any change in accounting

principle had taken place, nor did the Company attempt to justify the basis for such a change or why

it was preferable or disclose the effect of the change on net income. The effect of the Company's

change was material as Halliburton avoided the recognition of at much as $234 million and at least $121 million of costs as compared to net income from continuing operations of $551 million for 2001.

59.   On May 28, 2002, the last day of the Class Period, Halliburton issued a press release after the close of trading announcing that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs" and that the Company expected to receive a formal request for documents or a subpoena in the next few days. The Company's press release stated, however, that it believed that it has accounted for construction claims and change orders in accordance with GAAP. In reaction to the Company's announcement, the price of Halliburton common stock decreased by 3.3% on May 29, 2002, on extraordinary trading volume of over 13 million shares, many times the Company's average daily trading volume.

60.   The market for Halliburton's securities was open, well- developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Halliburton's common stock traded at artificially inflated prices during the Class Period.

61.   During the Class Period, the Company materially misled the investing public, thereby inflating the price of Halliburton's securities, by publicly issuing false and misleading statements in violation of GAAP and omitting to disclose material facts necessary to make defendant's statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, *inter alia*:

   a.   that the Company's financial statements were not prepared in accordance with GAAP and in accordance with the federal securities laws and SEC regulations concerning fair reporting; and

   b.   **that the Company's financial results were the result, in part, of improper accounting**

18

**entries; and**

c.     **that the Company's estimates, projections and opinions as to its expected revenues, earnings, income and value of its stock were lacking in reasonable basis at all relevant times.**

## THE DIRECTOR DEFENDANTS' WRONGDOING

62.     Unquestionably, the Director Defendants had a responsibility to ensure that proper financial controls and procedures were in place at Halliburton at all times.  Each of the Director Defendants personally benefitted from the failure of such financial controls and the wrongful overstatement of financial results which resulted in an unwarranted and excessive market price for the Company's stock.  The Director Defendants received benefits from the Company including stock options, by serving as directors.  The Director Defendants received such stock at a discount to the market price.  The Director Defendants knew that as a public company, Halliburton had a responsibility to its shareholders to maintain adequate financial controls and procedures.  The Director Defendants knew that Halliburton had issued, and would continue to issue, millions of shares of its stock to the public and that the public would rely upon the financial statements that were disseminated by the Company and approved by the Director Defendants.  They consequently knew that the public, including plaintiff, would rely upon Halliburton's financial statements and accounting procedures.

63.     Thus, the Director-Defendants wrongful conduct includes, but is not limited to, the following:

a.     Against the best interests of Halliburton and its shareholders, agreeing to allow, and permitting to continue, inadequate procedures and financial controls in connection with Halliburton's financial statements and accounting records;

b.     Permitting Halliburton to improperly account for the consolidation of its subsidiary;

c.     Allowing Halliburton to have inadequate procedures which had the effect of concealing the improper and inappropriate financial statements, thereby deceiving the public regarding its financial controls, compliance with GAAP and false financial statements; and

d.     Misinforming the public in numerous statements regarding Halliburton's financial controls

and procedures, financial performance and financial results as further stated herein.

64.     This conduct was engaged in the Director Defendants as a common courts of conduct and the

Director Defendants knew that they had a responsibility to the company and its shareholders that

they had breached.  The Director Defendants aided and abetted and/or assisted each other in the

wrongful conduct described herein.  Each Director Defendant acted with knowledge of the

responsibilities to the Company and its shareholders, knew that they had a responsibility to assure

that the financial statements and the financial procedures of the Company were in compliance with

GAAP and knew, or should have known, of the failures to comply with GAAP that are further

described herein.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

65.     Plaintiff brings this action derivatively in the right and for the benefit of Halliburton to redress

injuries suffered and to be suffered by Halliburton as a result of the breaches of fiduciary duty by the

Defendants, David J. Lesar, Robert L. Crandall, Kenneth T. Derr, Charles J. DiBona, Lawrence S.

Eagleburger, William R. Howell, Ray L. Hunt, Aylwin B. Lewis, J. Landis Martin, Jay A. Precourt,

Deborah L. Reed and C.J. Silas.  **This is not a collusive action to confer jurisdiction on this Court**

**which it would not otherwise have.**

66.     Plaintiff will adequately and fairly represent the interests of Halliburton and its shareholders in

enforcing and prosecuting its rights.

67.     Plaintiff is an owner of Halliburton common stock and was an owner of Halliburton common stock

at all times relevant to Defendants' wrongful course of conduct alleged herein.

68.     As a result of the facts set forth herein, plaintiff has not made a demand of the Halliburton Board of

Directors to institute this action against the individual Defendants.  Such demand would be futile and

useless act because the Board is incapable of making an independent and disinterested decision to

20

## JURY DEMAND

Plaintiff demands a trial jury trial.

Respectfully submitted,

Christopher Cafiero

CAFIERO, LENAHAN &LAFUENTE, P.C.
2926 Maple Ave., Suite 200
Dallas, Texas 75201
(214) 922-9200/Fax (214) 922-9266

-and-

Brian M. Felgoise, Esquire
261 Old York Road
The Pavilion - Suite 423
Jenkintown, PA 19046
(215) 886-1900

Attorneys for Plaintiff

22

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| Jack Friedberg, Derivatively on Behalf of<br>Nominal Defendant<br>HALLIBURTON COMPANY<br>        Plaintiffs,<br><br>   v.<br><br>DAVID J. LESAR, ROBERT L. CRANDALL,<br>KENNETH T. DERR, CHARLES J. DiBONA,<br>LAWRENCE S. EAGLEBURGER, WILLIAM<br>R. HOWELL, RAY L. HUNT, AYLWIN B.<br>LEWIS, J. LANDIS MARTIN, JAY A.<br>PRECOURT, DEBORAH L. REED, C.J. SILAS,<br>        Defendants,<br><br>   and<br><br>HALLIBURTON COMPANY<br>        Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civ. Act No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Local Rule 3.1(f), the following are parties to this litigation, including persons or other entities financially interested in the outcome of the litigation, but not revealed by the caption:

1) Jack Friedberg

2) David J. Lesar

3) Robert L. Crandall

4) Kenneth T. Derr

5) Charles J. DiBona

6) Lawrence S. Eagleburger

7) William R. Howell

8) Ray L. Hunt

9)  Aylwin B. Lewis

10)  J. Landis Martin

11)  Jay A. Precourt

12)  Deborah L. Reed

13)  C. J. Silas

14)  Halliburton Company

Respectfully Submitted,

Christopher J. Cafiero
Cafiero, Lenanhan & Lafuente, P.C.
State Bar No. 24031784
2926 Maple Ave
Suite 200
Dallas, Texas 75201
Tel. 214-922-9200
Fax. 214-252-0707

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

By my signature, I, the undersigned attorney hereby attest that a true and correct copy of the foregoing Plaintiff's Complaint was served upon Defendant's attorney, Mr. Jose L. Gozalez, Godwin & Gruber, L.L.P., 1201 Elm Street,  Dallas, Texas 75270 via personal delivery receipt on the 11th day of March, 2003.

Christopher J. Cafiero

## VERIFICATION

I, Jack Friedberg, have reviewed the Derivative Complaint to be filed in this matter and verify the content thereof to the best of my belief. I further authorize filing of same.

Date: _10 March 2003_

_Jack Friedberg_

Jack Friedberg